DORY BRENDAN HUX, Individually
and as Surviving Parent of DORY
BRAYLAN HUX and as Personal
Representative of the Estate of DORY
BRAYLAN HUX, a deceased Minor,

      Plaintiffs,

   vs.

NEUTROGENA CORPORATION;
JOHNSON & JOHNSON; and
JOHNSON & JOHNSON CONSUMER,
INC.,

      Defendants.

Case No.

Jury Trial Demanded

## ORIGINAL COMPLAINT

Plaintiff, DORY BRENDAN HUX, Individually and as Surviving Parent of DORY BRAYLAN HUX, and Personal Representative of the Estate of DORY BRAYLAN HUX, a deceased minor by and through his counsel, brings this Complaint against Defendants Neutrogena Corporation ("Neutrogena"), Johnson & Johnson ("J&J"), and Johnson & Johnson Consumer Inc., ("JJCI"), collectively referred to as "Defendants."

## INTRODUCTION

1.  This is an action brought on behalf of Plaintiff, DORY BRENDAN HUX, the father of deceased minor DORY BRAYLAN HUX, arising out of the failure of Defendants to design, test, market, formulate, test, manufacturer, advertise, and warn about the dangers of benzene contaminated sunscreen. As a result, the Plaintiffs have suffered permanent injuries, death, emotional distress, and significant pain and suffering. The suit seeks to recover damages from the Defendants for the wrongful death of the minor child and the family's loss of filial

1

consortium, including loss of services, society, companionship, comfort, love, and solace. The action also asserts survival claims on behalf of the estate of the minor child for the pain, suffering, and injuries he suffered prior to his death.

2.      This action centers on the design, marketing, manufacturing, formulation, post-marketing surveillance, testing, sale, advertising, promotion, warning, distribution, and recall of defective aerosol sunscreen products contaminated with known endocrine-disrupting ingredients and the carcinogens including benzene sold under the NEUTROGENA® brand, which is designed, manufactured, and distributed by the Defendants.

## PARTIES

3.      Plaintiff Dory Brendan Hux is a resident of North Carolina, the Surviving Father of Dory Braylan Hux, and Personal Representative of the Estate of Dory Braylan Hux.

4.      Decedent Dory Braylan Hux, was a resident of the State of North Carolina at the time of his death. Dory Braylan Hux is referred to herein as "Braylan."

5.      Defendant Neutrogena Corporation, hereinafter "Neutrogena" is a California business and resident of California with its headquarters located at 5760 W. 96th Street, Los Angeles, California 90045. Neutrogena was founded in 1930 by Emanuel Stolaroff and was originally a cosmetics company named Natone. It is now part of the United States-based Johnson & Johnson conglomerate, which bought the independent company in 1994.

6.      Defendant Johnson & Johnson, hereinafter "J&J" is a New Jersey corporation with its principal place of business at 1 Johnson Plaza, New Brunswick, New Jersey 08933. Johnson & Johnson may be served with process by serving its registered agent at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Johnson & Johnson and its subsidiaries are engaged in the research and development, manufacture, and sale of a broad range of products in the

2

healthcare field. Johnson & Johnson and its subsidiaries conduct business in virtually all countries of the world and are organized into three business segments: consumer health, pharmaceutical, and medical devices.

7.      Defendant Johnson & Johnson Consumer Inc., f/k/a Johnson & Johnson Consumer Companies, Inc., hereinafter "JJCI" is a New Jersey corporation with its headquarters and principal place of business in the State of New Jersey. Johnson & Johnson Consumer Inc. may be served with process by serving its registered agent, C.T. Corporation System, located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615.

8.      Neutrogena, J&J, and JJCI, are collectively referred to herein as "Defendants."

9.      At all relevant times, upon information and belief, the Defendants were engaged in the business of manufacturing, formulating, labeling, marketing, testing, promoting, selling, and distributing Defective Sunscreen Products. At all relevant times, Defendants regularly transacted, solicited, and conducted business in the State of North Carolina.

10.     At all times relevant herein, Defendants were engaged in the business of placing Defective Sunscreen Products into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and selling.

11.     Upon information and belief, Neutrogena and JJCI are mere alter egos that act under the sole direction and control of the officers and directors of J&J. J&J is liable for the actions and inactions effectuated under the masks of Neutrogena and JJCI, there is such a unity of interest and ownership between them that the separate corporate personhoods cease to exist. J&J operates on paper as multiple companies but pragmatically as a single enterprise, controlled from the top down by the officers, executives, agents, and directors of J&J. Upon information and belief, J&J have commingled their assets and funds, disregarded corporate formalities,

3

reorganized corporate structure, and used subsidiary and intermediary entities to defeat justice, perpetrate fraud, and evade or diminish contractual and tort liability. Defendants acted in all respects as agents or apparent agents of one another.

## JURISDICTION & VENUE

12.    There is complete diversity of citizenship between Plaintiff and Defendants, and the amount of controversy exceeds $75,000.00. Subject-matter jurisdiction, therefore, exists under 28 U.S.C. § 1332.

13.    Defendants have significant minimal contacts with this judicial district, having done substantial business in this district and purposefully availed themselves of the benefits and protections of the laws of this district. Defendants regularly transacted business in North Carolina that included marketing and selling the Defective Sunscreen Products at issue. They derive substantial revenue from their business transactions in North Carolina and have purposely availed themselves of the privilege of doing business in North Carolina. Defendants are, therefore, subject to specific personal jurisdiction in North Carolina and this judicial district.

14.    Plaintiffs purchased the Defective Sunscreen Products at issue in Gaston County, North Carolina. Venue is proper under 28 U.S.C § 1391(a) in that a substantial part of the events giving rise to the causes of action occurred in this judicial district.

## FACTS

15.    Plaintiffs hereby incorporate every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

**Background on Sunscreen**

16.     This history of sunscreen can be traced back thousands of years, but the development of modern sunscreen products began in the 20th century.[1] The explosion of modern-day sunscreens was prompted by the understanding of the mechanism of sun damage. Companies such as Defendants were quick to capitalize and began the race to develop and market these new products to a growing base of consumers. The sunscreen market became so large that in 1978 the US Food and Drug Administration decided to regulate it as a drug.[2]

17.     In the 1980s, it became obvious that a popular ingredient in sunscreen formulations, para-aminobenzoic acid (PABA), and its derivatives were harmful and removed from sunscreens due to their carcinogenic potential.[3] This led to increased concerns about the potential health and environmental impacts of chemicals used in sunscreens. These concerns have led to the development of mineral-based sunscreens that use zinc oxide or titanium dioxide as safer active ingredients/designs.

18.     Sunscreen drug products such as those manufactured by the Defendants at issue here are intended and marketed for daily application on the skin, the body's largest organ, leading to significant dermal exposure of its chemical components. Sunscreen ingredients have been found to penetrate the skin raising concerns about potential health effects. In addition, many sunscreen products, including those at issue here, have been formulated for delivery via aerosol spray application, thereby increasing the potential for inhalation exposure to the chemical components.

---

[1] Madeeha Drissi, Emily Carr & Chad Housewright, *Sunscreen: a brief walk through history*. 35(1) PROC (BAYL UNIV MED CENT) 121 (Sept 1, 2021) . DOI: 10.1080/08998280.2021.1966602; PMID: 34970060; PMCID: PMC8682817.
[2] Adam S. Aldahan, Vidhi V. Shah, Stephanie Mlacker & Keyvan Nouri, *The History of Sunscreen*. 151(12) JAMA DERMATOL 1316 (2015). DOI:10.1001/jamadermatol.2015.3011; PMID: 2660657.
[3] *Id.*

19.     Concerns were raised about the safety and efficacy of aerosol sunscreen products in 2019 when the FDA proposed a new rule to regulate non-prescription over-the-counter sunscreen drug products. The FDA asked manufacturers for safety data on chemical ingredients, including octocrylene. Octocrylene may degrade to benzophenone, a chemical for which there is sufficient evidence in animal models to classify as a carcinogen, according to the International Agency for Research on Cancer (IARC). A group of concerned scientists, including a toxicologist who spent 38 years formulating chemical sunscreens, have further called for the removal of Octocrylene, and other common active sunscreen ingredients from the market due to serious safety concerns or, in the alternative, require additional warnings on products which contain these active ingredients.

20.     The safety of aerosol spray sunscreens is also a concern for the FDA, particularly regarding the risk of inhalational toxicity from harmful chemicals that may be present.

21.     The Defendants are manufacturers of various aerosol sunscreens. Upon information and belief, Neutrogena was first introduced to the market in 1930 as a cosmetics company, but it was not until J&J acquired the company and brand in 1994 that it started to expand its product line to include sunscreens. The introduction of Neutrogena's sun care products can be traced back to the late 1990s and early 2000s. Defendants capitalized on Neutrogena's brand reputation and goodwill to promote, market, sell, and profit off Neutrogena branded sunscreen products.

**Background on Benzene**

22.     Benzene is an organic chemical compound known for its toxic and carcinogenic properties. It is widely used in industrial processes and is a component of various consumer

products, including gasoline, solvents, and adhesives. Human exposure to benzene can occur through inhalation, ingestion, and dermal contact.[4]

23.    The IARC has classified benzene as a Group 1 carcinogen, meaning that it is carcinogenic to humans.[5] Benzene exposure has been established as a risk factor for developing Acute Myeloid Leukemia (AML), and there is strong evidence supporting a causal association between benzene exposure and AML.

24.    Children are at a heightened risk for developing complications and illness due to toxic chemical exposures. The Agency for Toxic Substances and Disease Registry (ASTDR) peer review panel for benzene identified risk factors with human data to support increased susceptibility to benzene toxicity and identified the following: genetic polymorphisms associated with processes related to benzene metabolism; medical conditions that include reduced bone marrow function or decreased blood factors; ethanol use, which can enhance the hemotoxic effects of benzene.[6]

25.    Benzene is classified as a "known human carcinogen" and is directly linked to cancer in humans, even with low levels of exposure as low as 0.8 ppm.[7] Additionally, researchers

[4] Toxicological Profile for Benzene. Agency for Toxic Substances and Disease Registry. https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[5] International Agency for Research on Cancer, CHEMICAL AGENTS AND RELATED OCCUPATIONS, VOL. 100F A REVIEW OF HUMAN CARCINOGENS: IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS (2012). https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Chemical-Agents-And-Related-Occupations-2012
[6] Toxicological Profile for Benzene. Agency for Toxic Substances and Disease Registry. https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[7] Deborah C. Glass, Christopher N. Gray, Damien J. Jolley, Carl Gibbons, Malcolm R. Sim, Lin Fritschi, Geoffrey G. Adams, John A. Bisby &  Richard Manuell,  Leukemia Risk Associated With Low-Level Benzene Exposure, 14(5) EPIDEMIOLOGY  569 (2003). DOI: 10.1097/01.ede.0000082001.05563.e0; PMID: 14501272.

at Health Canada's Bureau of Chemical Hazards have found that sunscreen application increases the absorption rate of benzene through the skin.[8]

26.     Benzene is a highly reactive and unstable chemical that can undergo metabolic activation in the body, leading to the formation of reactive metabolites that can damage DNA and other cellular components. These reactive metabolites can cause mutations and other genetic changes that can lead to the development of cancer.

27.     In addition to its direct genotoxic effects, benzene exposure can also lead to oxidative stress, which can cause cellular damage and inflammation. This can lead to changes in gene expression and other epigenetic modifications that can contribute to the development of cancer.

**Plaintiffs Background & Exposure**

28.     Plaintiffs were brand loyal purchasers of Neutrogena products, including sunscreens, opting for the brand over others due to the perceived superiority of the product. Specifically, the Plaintiffs regularly and exclusively purchased and used Neutrogena Beach Defense, Neutrogena Cool Dry Sport, and Neutrogena Ultra Sheer aerosol sunscreen products hereinafter "Defective Sunscreen Products" for numerous years, beginning in 2009 until late 2021.

29.     Braylan was a vibrant and healthy child who had a great love for his family. He excelled at and enjoyed playing soccer, which was truly his passion. Braylan cherished being an older brother and had an unbreakable bond with his sister. His parents were at the center of his world, and he expressed his love for them in countless ways.

---

[8]J. S. Nakai, I. Chu,A. Li-Muller & R. Aucoin. *Effect of environmental conditions on the penetration of benzene through human skin*. 51(5) J Toxicol Environ Health 447 (1997). DOI: 10.1080/00984109708984036; PMID: 9233379.

8

30.     Braylan began playing soccer at the age of 3 and quickly developed a talent and skill that was recognized by his parents and the community. At the age of 7, he tried out and was recruited to join a travel soccer organization. He was also a member of his middle school soccer team. Braylan continued to play soccer competitively until his tragic death at the age of 14.

31.     The Plaintiffs purchased and used the Defendants' Neutrogena brand Defective Sunscreen Products on Braylan during his soccer practices and games, which occurred 4-5 times per week for both school and travel teams. The use of sunscreen was a continuous and routine practice for the family. Braylan's father and mother applied the aerosol sunscreen to his entire torso, legs, neck, arms, and face, following the directions for use by spraying the product liberally and spreading it evenly by hand. Each application was repeated 2-3 times per game/practice, consistent with the product's directions. These practices resulted in Braylan being exposed to contaminated sunscreen for approximately 12-20 hours per week over the course of many years.

32.     The Plaintiffs' most recent purchase of Defendant's Defective Sunscreen Products included a bottle of Neutrogena Beach Defense aerosol sunscreen, SPF 50 bearing lot # 32520E01, Exp: October 2023, UPC # 0 86800 11254 9, production date 11-20-2020, which was contaminated with dangerously high levels of the carcinogen Benzene. The Sunscreen was liberally applied to Braylan's body per the usual custom of Plaintiffs and per the directions on the product. Plaintiffs regularly purchased and used this brand along with two other Neutrogena products, as detailed in this Complaint. Upon information and belief, it is alleged that this was not the first and only Neutrogena Defective Sunscreen Products product to be contaminated with Benzene and used by Plaintiff, and other Defective Sunscreen Products used on Braylan between the ages of 3 to 14 were also defective and contaminated with Benzene and/or formulated with ingredients that increased the susceptibility of Braylan to the development of cancer. Given the

duration, frequency, and extent of Braylan's exposure to the Defective Sunscreen Products, the risk of harm to his health was substantial and foreseeable to Defendants.

33.     Braylan's exposure to the Defendants' Defective Sunscreen Products contaminated with benzene was not limited to his soccer practices and games, as he also used the product regularly during trips to the pool or beach, resulting in prolonged and significant exposure.

34.     On or around April 15, 2021, Braylan was admitted to Levine Childrens Hospital after his family care provider obtained labs that were notable for elevated white blood cells. He was admitted to the hospital, and on April 16, 2021, he was diagnosed with AML and began chemotherapy.

35.     On April 17, 2021, Braylan began demonstrating labile blood pressure with associated bradycardia, acute respiratory failure, and profound shock with severely reduced biventricular function and was placed on life support.

36.     Despite the Hux family's unrelenting hope and Braylan's unwavering courage, on April 18, 2021, they were faced with the devastating realization that his condition was no longer treatable, and under the advice of physicians, they made the agonizing decision to discontinue all life-sustaining therapies, a decision that would ultimately lead to his passing.

37.     An autopsy was performed on April 19, 2021, and the cause of death was determined to be complications of acute myeloid leukemia with extensive myeloid sarcoma and cardiac arrest secondary to AML.

38.     Braylan's untimely death was a result of repeated and continuous exposure to the defendant's Defective Sunscreen Products, which were contaminated with benzene. The contamination is believed to have occurred through a systematic and ongoing process due to the Defendant's negligence in several ways:

a. Contamination during blending: The Defendants negligently allowed equipment used for blending the active ingredients and propellant to become contaminated with benzene, resulting in the transfer of benzene to the aerosol sunscreen product.

b. Contaminated propellant: The Defendants negligently used propellants containing trace amounts of benzene, which were introduced into the aerosol sunscreen product during the blending process.

c. Degradation of active ingredients: The Defendants negligently failed to prevent or address the degradation of active ingredients in their sunscreen products, leading to the formation of benzene within the aerosol product.

d. Contamination with untested raw materials or ingredient sources: The Defendants negligently used untested or contaminated raw materials or ingredient sources, including both active and inactive ingredients such as propellants and alcohols, resulting in benzene contamination in the sunscreen products.

e. Synergistic effects of long-term exposure to sunscreen products: The Defendants negligently failed to account for, warn of, or mitigate the synergistic effects of long-term exposure to their sunscreen products, which increased the decedent's susceptibility to developing cancer, facilitated the final contaminated product to overcome the decedent's body, and ultimately led to their death.

39. From 2009 to 2021, the Plaintiffs exclusively purchased and used the Defective Sunscreen Products for Braylan. Due to his fair skin, Braylan required heavy application of

sunscreen whenever he was exposed to sunlight. During the same period, the Plaintiffs exclusively applied Defective Sunscreen Products on Braylan, which contained benzene, due, inter alia, to insufficient removal of residual solvents in the manufacturing and supply chain processes. Given that crude petroleum is a raw material used in these processes, the Defendants should have been aware of the heightened risk of contamination by residual solvents, including benzene. Despite this knowledge, the Defendants failed to implement adequate systems or controls to eliminate residual solvents, such as carcinogenic benzene, from their aerosol spray sunscreen products.

**Benzene Contamination of Defendants' Sunscreen**

40.     Valisure, an independent healthcare laboratory with a mission to improve transparency and quality assurance, detected significant amounts of benzene in certain sunscreen product batches during their internal testing. As a result, Valisure filed a citizen petition on May 24, 2021, appealing to the FDA commissioner to address the situation based on the gathered evidence.[9] Valisure found dangerous levels of Benzene in numerous sunscreens manufactured by the Defendants, including those at issue here.[10]

41.     Based on information and belief, Valisure's investigation uncovered a systematic and ongoing contamination issue, exposing the Defendants' hidden negligence in producing Defective Sunscreen Products contaminated with benzene, a known carcinogen. The Defective Sunscreen Products posed significant dermal and inhalation risks to vulnerable populations. Consequently, the Defendants were compelled to conduct their own testing and perform a mandatory Health Hazard Evaluation (HHE) on sunscreen products implicated in their

---

[9] https://downloads.regulations.gov/FDA-2022-P-2707-0001/attachment_1.pdf
[10] Neutrogena Beach Defense, Cool Dry Sport, and Ultra Sheer aerosol sunscreen products.

misconduct. This testing revealed benzene contamination in various aerosol sunscreen products, with levels ranging from 11.2 to 23.6 ppm.

42.    In response, the FDA's Office of Compliance requested its own HHE (HHE) report from the Office of New Drugs on July 7, 2021, to assess an internal HHE carried out by the Defendants.[11] The Office of New Drugs concluded that adverse events were more probable in children and other at-risk populations, and the health hazards connected to the use of the defective sunscreen could involve life-threatening complications, including death.

43.    On July 14, 2021, the Defendants were mandated to issue a Class I and Class II recalls,[12] which are currently ongoing and have included approximately 23,483,048 aerosol cans contaminated with Benzene.[13] The recall includes specific aerosol sunscreen products under the NEUTROGENA® and AVEENO® brands due to the contamination with benzene, and includes the lot number and specific UPC number, which Plaintiffs most recently purchased and used on Braylan before his tragic benzene toxicity-induced death. The recall affected the following products, which include those Defective Sunscreen Products Plaintiffs regularly purchased as set forth in this Complaint:

    a.  Neutrogena Beach Defense aerosol sunscreen

    b.  Neutrogena Cool Dry Sport aerosol sunscreen

---

[11] CDER Health Hazard Evaluation, noting "[Johnson & Johnson] testing found benzene contamination above ICH and USP limits. Benzene results ranged from 11.2 to 23.6 ppm." Available at https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment

[12] A Recall is a firm's removal or correction of a marketed product that FDA considers to be in violation of the laws it administers, and against which the Agency would initiate legal action, such as a seizure. Recalls are classified by FDA with a numerical designation of I, II, or III to indicate the relative degree of health hazard presented by the product being recalled. Class I recall: a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death. Class II recall: a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote.

[13] Recall Enforcement Report, available at https://www.accessdata.fda.gov/scripts/ires/index.cfm?Event=88288

c. Neutrogena Invisible Daily defense aerosol sunscreen

d. Neutrogena Ultra Sheer aerosol sunscreen

e. Aveeno Protect + Refresh aerosol sunscreen.

44. As of now, the Defendants have not released their internal HHE evaluation on the aerosol sunscreen products tested nor any root cause analysis or explanation for how a known carcinogen found its way into millions of cans of aerosol sunscreen. Defendants are undoubtedly in possession of this critical safety information that is being purposefully absconded to avoid corporate embarrassment, negative press, and lost profits. Put simply, Defendants have chosen to prioritize corporate profits over public health.

45. In recalling the products, Defendants misrepresented the facts about the levels of benzene detected in the Defective Sunscreen Products. Specifically, Defendants represented that the testing detected "low" levels of benzene in the recalled products. In reality, testing detected "high" levels of benzene, which was accurately described by Valisure when it petitioned the FDA to force a recall. Yet Defendants chose to misrepresent the level of benzene detected in the Defective Sunscreen Products, downplaying the danger presented.

46. It is incontrovertible that no safe level of benzene for human exposure exists.

47. Defendants use a propellant system for their aerosol sunscreen products. Aerosol products are made by combining a product's active ingredients with a propellant and packaging the mixture in a pressurized container. The propellant, usually a liquefied gas, is responsible for expelling the product out of the container when the nozzle is pressed. The process of creating aerosol products involves multiple steps, including formulation, blending, filling, and packaging.

48.     There are several different kinds of aerosol propellants that can be used for aerosol spray products. The most common are mixtures of volatile hydrocarbons, typically propane, n-butane and isobutane. Dimethyl ether (DME) and methyl ethyl ether are also used.

49.     Defendants NEUTROGENA® aerosol spray sunscreen, designed the propellant system to use a volatile hydrocarbon, isobutane. Isobutane is a colorless, odorless gas. Isobutane is commonly used in the petrochemical industry. Isobutane is made through an isomerization[14] of butane. Butane is a liquefied petroleum gas that is found in crude petroleum.

50.     Defendants did not have appropriate systems in place to remove residual solvents from its finished aerosol spray drug products, including the recalled products. Residual solvents are volatile organic chemicals, such as benzene, that are used or produced in the manufacture of its NEUTROGENA® aerosol spray sunscreen.

51.     Because Defendants did not have appropriate systems in place to remove residual solvents from its finished aerosol sunscreen products, the over-the-counter pharmaceuticals it manufactured, sold, and produced that are at issue in this case, were contaminated with benzene, a known human carcinogen that is found in crude petroleum, which is one of the raw materials Defendants uses in the manufacturing and supply chain process for the production of NEUTROGENA® aerosol spray sunscreen. Because crude petroleum is a raw material that Defendants purposefully uses in the manufacturing and supply chain process to produce NEUTROGENA® aerosol spray sunscreen, Defendants had a duty of care to remove residual solvents and prevent harmful chemicals, including benzene, from being present in the finished product, a drug as regulated by the FDA.

---

[14] Isomerization refers to the process by which a molecule is transformed into an isomer with a different chemical structure.

52.     Because the presence of benzene in NEUTROGENA® aerosol sunscreen was not disclosed to Plaintiffs, they were unable to prevent Braylan's exposure to this dangerous chemical.

53.     Defendants owed a duty not to cause Plaintiff an unreasonable risk of injury due to a defect or lack of safety or efficacy with the Defective Sunscreen Products. This includes a duty to conduct adequate and well-controlled testing before marketing and during post-marketing surveillance.

54.     But Defendants provided consumers including Plaintiff with false and misleading information about product safety and efficacy even though they knew or should have known about the dangers disclosed in the recall well before July 14, 2021.

55.     Defendants also chose to market and sell the Defective Sunscreen Products in a way to maximize sales but minimize health and safety, failing to conduct adequate testing or failing to appropriately inform consumers about the presence of benzene before the Valisure testing.

56.     Defendants wrongfully withheld and continue to withhold information on the true risks of their Defective Sunscreen Products, by issuing watered down statements by publication relations firms designed to marginalize safety issues and provide cover for the malfeasance and negligence of the defendants.

57.     Because Defendants wrongfully withheld the true information about these dangers, there has been pervasive use of Defective Sunscreen Products when other safer alternatives are available.

58.     Indeed, safer alternatives to hydrocarbon-based aerosol propellants exist. Such safer alternatives do not carry the same risk of contamination with residual solvents, including benzene. Defendants chose not to use any safer alternative and instead used a hydrocarbon-based aerosol propellant, which resulted in contamination with benzene.

59.     Defendants negligently, willfully, wantonly, and/or recklessly failed to warn about the true risks, dangers, defects, and disadvantages of the Defective Sunscreen Products. Defendants instead suppressed the true risks and benefits, including the presence of harmful chemicals in the Defective Sunscreen Products.

60.     Defendants knew or should have known that the Defective Sunscreen Products are not safe for the intended and ordinary purpose for which they are sold. These Defective Sunscreen Products are likely to cause and do cause serious injury and death.

61.     Plaintiffs assert no claim for fraud on the FDA. Rather, Plaintiff's claims center on the Defendants' negligence, defective design, and failure to warn about the dangers they knew or should have known. The Defendants knew or should have known about these dangers through appropriate review, testing, and post-marketing surveillance. There is a presumption against federal preemption of state laws that operate in traditional state domains. It is black-letter law that manufacturers must warn of dangers that they know or should know exist with ordinary use of their products, and this duty continues after sale. State law claims may therefore parallel federal-law duties existing under the FDA regulations.

62.     Defendants have underreported and misreported adverse-event information about the propensity of their Defective Sunscreen Products to cause serious injury, complications, and death. They have misrepresented the efficacy and safety of the Defective Sunscreen Products generally, downplaying the risks and overstating the benefits through various means and media, actively and intentionally misleading the FDA and the public at large.

63.     At all times relevant hereto, Plaintiffs were exposed to and regularly used the Defective Sunscreen Products, in an intended or reasonably foreseeable manner. Plaintiffs used the Defective Sunscreen Products without knowing about the unreasonably dangerous

characteristics. Had the unreasonably dangerous features of the Defective Sunscreen Products been made known, the Plaintiffs would never have used the products. Plaintiffs would instead have used other safer alternatives in existence and available on the market.

64.     The harm caused by the Defective Sunscreen Products far outweighs the benefits, rendering the products unreasonably dangerous to an extent beyond that which an ordinary consumer would consent.

65.     Plaintiff would never have consented to use the Defective Sunscreen Products, had the true dangers, risks, and benefits first been made known.

66.     The Defective Sunscreen Products are more dangerous than available alternative products. Defendants could have designed and tested the products to make them less dangerous—without benzene. A less risky design or formulation was attainable at the time of manufacture and sale.

67.     At the time the Defective Sunscreen Products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended utility.

68.     Defendants' defective design was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users like the Plaintiffs.

69.     Because of the unreasonably dangerous condition of their Defective Sunscreen Products, Defendants are liable for negligence, breach of warranty, and for product liability claims.

## COUNT I – PRODUCT LIABILITY – DESIGN DEFECT

70.     Plaintiff realleges and incorporates by reference every paragraph of this Complaint as though fully set forth herein.

71. The Defective Sunscreen Products are defectively designed in that they are unreasonably dangerous and do not meet the reasonable expectations of the ordinary consumer or user as to safety. The warnings, moreover, do not adequately cover the defects made known by the recall (July 14, 2021), including:

i. The Defective Sunscreen Products are defective in design and formulation:

ii. The dangers are beyond that which an ordinary consumer would contemplate;

iii. The products are unreasonably dangerous given the presence of benzene, a volatile organic compound (VOC) that causes cancer and other serious illnesses;

iv. The products are unreasonably dangerous because they are consumer drugs that are manufactured with a hydrocarbon-based aerosol propellant system that predictably results in contamination with benzene, a known human carcinogen for which no safe level of human exposure exists;

v. The products are unreasonably dangerous when used in a reasonably anticipated manner;

vi. Defendants did not timely disclose the results of earlier tests or studies of the products showing the presence of benzene or VOCs.

vii. Using the products presents a risk of serious injury that outweighs any potential utility of the products.

viii. Defendants knew or should have known at the time of marketing and continued marketing and selling the products, that ordinary use could result in cancer and other severe illnesses and injuries;

ix. Instead of timely disclosing the dangers—the risks of cancer—Defendants continued to market, sell, and promote the products until their negligence was unearthed;

x. The lack of adequate post-marketing surveillance; and

xi. The existence of safer alternative designs and formulations making them less prone to causing cancer and other adverse health conditions, including but not limited to aerosol propellant systems based on DME or MEE instead of hydrocarbons.

19

72.     The Defective Sunscreen Products were defective in design when they left the possession of the Defendants' control. There was no substantial change from the time they left the possession of Defendants until they reached Plaintiff.

73.     There was a safer and more practical alternative design that Defendants could have used at the time that they made and sold the Defective Sunscreen Products; to wit, a DME or MEE aerosol propellant system as opposed to hydrocarbon.

74.     Plaintiff was caused substantial harm and suffered both economic and noneconomic damages by the design defects in the Defective Sunscreen Products, including loss of enjoyment of life.

75.     The Defective Sunscreen Products are unreasonably dangerous and defective, unfit, and unsafe for the intended use and reasonably foreseeable uses and do not meet or perform to the expectations of the ordinary consumer.

76.     The Defective Sunscreen Products are defective in design because they fail to perform as safely as people who ordinarily use the products would expect at time of use.

77.     Braylan used the Defective Sunscreen Products in a manner that was reasonably foreseeable to the Defendants.

78.     Plaintiff could not have, by the exercise of reasonable care discovered the defective conditions or perceived the unreasonable dangers and unreasonably dangerous propensities before Braylan's tragic death.

79.     As a result of the foregoing design defects, the Defective Sunscreen Products create risks to the health and safety of its users that are far more significant and devastating than the risks posed by other products available, and which far outweigh the utility of the products.

80.    Defendants have intentionally and recklessly designed the Defective Sunscreen Products with wanton and willful disregard for the rights and health of Plaintiff, and with malice, placing their economic interests above the health and safety of Plaintiff.

81.    As a proximate result of the Defendants' design, Plaintiff has been injured seriously and has sustained severe and permanent pain, suffering, disability, impairment, and death. Plaintiff has sustained loss of enjoyment of life, loss of care, comfort, and economic damages.

## COUNT II - STRICT LIABILITY – FAILURE TO WARN

82.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

83.    The Defective Sunscreen Products are dangerous when used as intended. Defendant failed to give adequate warnings about the dangers and propensities of the products to cause unreasonable harm when used as intended.

84.    The Defective Sunscreen Products were used as intended. Defendants either knew or should have known, through post-marketing surveillance and otherwise, that the product could create the kinds of dangers complained about when used as intended and in its ordinary and customary manner.

85.    No timely adequate warning was made about the kinds of dangers described here.

86.    The Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of the failure to warn about the danger.

87.    At the time the Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Defective

Sunscreen Products, they knew or should have known that the products presented an unreasonable danger when put to intended and/or reasonably anticipated use.

88.     Defendants knew or should have known, and therefore should have warned about the following dangers:

i.     The Defective Sunscreen Products are defective in design and formulation:

      ii.     The dangers are beyond that which an ordinary consumer would contemplate;

      iii.     The products are unreasonably dangerous given the presence of benzene, a volatile organic compound (VOC) that causes cancer and other serious illnesses;

      iv.     The products are unreasonably dangerous because they are consumer drugs that are manufactured with a hydrocarbon-based aerosol propellant system that predictably results in contamination with benzene, a known human carcinogen for which no safe level of human exposure exists;

      v.     The products are unreasonably dangerous when used in a reasonably anticipated manner;

      vi.     Defendants did not timely disclose the results of earlier tests or studies of the products showing the presence of benzene or VOCs.

      vii.     Using the products presents a risk of serious injury that outweighs any potential utility of the products.

      viii.     Defendants knew or should have known at the time of marketing and continued marketing and selling the products, that ordinary use could result in cancer and other severe illnesses and injuries;

      ix.     Instead of timely disclosing the dangers—the risks of cancer—Defendants continued to market, sell, and promote the products until their negligence was unearthed by independent testing;

      x.     The lack of adequate post-marketing surveillance; and

      xi.     The existence of safer alternative designs and formulations making them less prone to causing cancer and other adverse health conditions.

89.     Defendants failed to warn about the level of research and testing of the Defective Sunscreen Products, including the true results of the available testing, and known information from complaints and adverse events.

90.     The risks associated with the Defective Sunscreen Products are of such a nature that consumers could not have recognized the potential harm without the information disclosed via the recall.

91.     The Defective Sunscreen Products were defective and unreasonably dangerous at the time of release into the stream of commerce due to the inadequate warnings, labeling and/or instructions accompanying the product.

92.     When used by the Plaintiff, the Defective Sunscreen Products were in the same condition as at the time of manufacture, inspection, marketing, labeling, promoting, distributing and sale.

93.     Defendants willfully, intentionally, recklessly, deliberately, negligently, and/or and maliciously misrepresented the safety, risks, and benefits to advance their own financial interests, with wanton and willful disregard for the rights and health of the Plaintiff.

94.     As a proximate result of the Defendants' failure to warn, Plaintiff was injured seriously, sustained severe pain, suffering, disability and impairment, and death. Plaintiff sustained loss of enjoyment of life, loss of health, comfort, and economic damages.

## COUNT III – NEGLIGENCE/NEGLIGENT DESIGN, MANUFACTURE & SALE

95.     Plaintiff realleges and incorporates by reference every paragraph of this Complaint as though fully set forth herein.

96.     Defendants negligently designed, manufactured, supplied, distributed, and sold the Defective Sunscreen Products.

97. Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of the negligent, design, manufacture, and sale.

98. Negligence was a proximate cause of the Plaintiffs harm and damages.

99. Defendants had a duty to exercise reasonable and ordinary care in the manufacture, design, labeling, instruction, warning, sale, marketing, safety surveillance and distribution of the Defective Sunscreen Products to avoid exposing Plaintiff to foreseeable and unreasonable risks of harm.

100. Defendants breached their duty of care to the Plaintiff, in the manufacture, design, labeling, warning, instructions, sale, marketing, safety surveillance, and distribution of the Defective Sunscreen Products.

101. Defendants knew or should have known that the Defective Sunscreen Products were unreasonably dangerous when used ordinarily and as intended.

102. Defendants knew or should have known that the Defective Sunscreen Products when used as they marketed and sold are unreasonably dangerous and have the defects described herein.

103. Defendants knew or reasonably should have known that the Defective Sunscreen Products are more dangerous or likely to be dangerous when as intended or in a reasonably foreseeable manner. Defendants had a duty to avoid causing an unreasonable risk of harm to the Plaintiff.

104. At the time of manufacture and sale, Defendants knew or should have known that using the Defective Sunscreen Products for intended use or in a reasonably foreseeable manner created a significant risk of a patient suffering and severe injuries, including cancer, autoimmune disorders, and cardiac injury.

105.     Defendants breached their duty to exercise reasonable and prudent care in the development, testing, manufacture, inspection, marketing, labeling, promotion, distribution, and sale of the Defective Sunscreen Products.

106.     A reasonable manufacturer, distributor, and/or seller under the same or similar circumstances would not have engaged in the acts and omissions complained about herein.

107.     As a proximate result of the Defendants' design, manufacture, marketing, sale, and/or distribution of the Defective Sunscreen Products, Plaintiff was injured seriously, sustained severe pain, suffering, disability and impairment, and death. Plaintiff sustained loss of enjoyment of life, loss of health, comfort and economic damages.

## COUNT IV – NEGLIGENT FAILURE TO WARN

108.      Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

109.     The Defective Sunscreen Products are dangerous when used as intended. Defendants failed to give adequate warnings about the dangers and propensities of the product to cause unreasonable harm when used as intended.

110.     The Defective Sunscreen Products were used as intended. Defendants either knew or should have known, through post-marketing surveillance and otherwise, that the Defective Sunscreen Products could create the kind of dangers described here when used as intended and in its ordinary and customary manner.

111.     No timely adequate warning was made about the kind of danger described here.

112.      The Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of the failure to warn about these dangers.

113. At the time the Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Defective Sunscreen Products, they knew or should have known that the products present an unreasonable danger to patients when put to intended or reasonably anticipated use.

114. Defendants owed a duty to avoid causing the Plaintiff an unreasonable risk of injury by providing adequate warnings.

115. Defendants failed to warn about the level of research and testing of the Defective Sunscreen Products properly and adequately and failed to so warn about the propensities of the product to cause cancer and other serious injuries and health problems.

116. As a proximate result of the Defendants' negligent failure to warn, the Plaintiff was injured seriously, sustained severe pain, suffering, disability and impairment, and death. Plaintiff sustained loss of enjoyment of life, loss of health, comfort and economic damages.

## COUNT V - MISREPRESENTATION

117. Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

118. Defendants falsely and fraudulently presented to the public that the Defective Sunscreen Products had been tested and were safe and effective.

119. The representations made by Defendants were, in fact, false. When Defendants made their representations, Defendants knew and/or had reason to know that those representations were indeed false, yet Defendants negligently, willfully, wantonly, and recklessly disregarded the inaccuracies in their representations about the dangers of the Defective Sunscreen Products.

120.    These representations were made by Defendants with the intent of defrauding and deceiving the public, and also inducing consumers at large to purchase the Defective Sunscreen Products for use, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers including the Plaintiff.

121.    In representations to Plaintiff and the public, Defendants fraudulently concealed and intentionally or recklessly omitted the following material information about the Defective Sunscreen Products:

  i.      That the products are not as safe as other similar products available;

  ii.     That the products are not more effective than other similar products available;

  iii.    The products are unreasonably dangerous because they are consumer drugs that are manufactured with a hydrocarbon-based aerosol propellant system that predictably results in contamination with benzene, a known human carcinogen for which no safe level of human exposure exists;

  iv.     That the products contain harmful chemicals due to the presence of residual solvents that are not removed from the finished product;

  v.      That the products are not appropriately tested for safety and efficacy, including the failure to study the products as obligated under FDA rules and regulations;

  vi.     That the likelihood of an adverse event requiring serious medical attention with the products is much higher than with the other similar products available;

  vii.    That the testing and surveillance shows the products have a higher risk of adverse effects beyond those associated with other similar products available;

  viii.   That Defendants deliberately failed to follow up on the adverse results from studies and formal and informal reports and buried and/or misrepresented those findings;

  ix.     That Defendants deliberately chose to forego studies that might reveal the true levels of benzene present and rate of adverse events or otherwise

necessitate the need to reveal information as to adverse events to the Plaintiff or the regulatory authorities;

x. That Defendants were aware of dangers beyond those associated with other similar products available;

xi. That the products are defective, and that they cause dangerous and adverse health consequences, including cancer;

xii. That users of the products need to be medically monitored; and

xiii. That the products contain benzene, which is harmful to humans, and causes cancer, serious injury, and death;

122. Defendants were under a duty to disclose the defective nature of the Defective Sunscreen Products, including but not limited to the heightened risks of cancer, injury, and death. Defendants had access to the full material facts concerning the defective nature of the products and the propensity to cause serious injury and death.

123. Defendants' concealment and omissions of material fact were done negligently, purposefully, willfully, wantonly, and/or recklessly to mislead, to cause Plaintiff and consumers to purchase the Defective Sunscreen Products; and/or to mislead Plaintiff and consumers into reliance and cause Plaintiff to use the Defective Sunscreen Products.

124. At the time these representations were made, and at the time the Plaintiff used the recalled products, and was unaware of the falsehood of these representations, and reasonably believed them to be true.

125. Defendants knew and had reason to know that the Defective Sunscreen Products could and would cause serious injury, and that the Defective Sunscreen Products are inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

126. In reliance upon these false misrepresentations, the Plaintiff was induced to and did use the recalled products in a pervasive manner. The Plaintiff thereby sustained severe and personal injuries and damages.

127. Defendants knew or had reason to know that Plaintiff and consumers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the Defective Sunscreen Products, as described in detail herein.

128. Plaintiff reasonably relied on revealed facts which foreseeably and purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Defective Sunscreen Products.

129. Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring Plaintiff, the public, and consumers at large, that the Defective Sunscreen Products are safe for use and as safe or safer than other products available on the market.

130. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed, and suppressed certain results of testing and research to Plaintiff and the public at large.

131. Defendants had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, Plaintiff, and the United States Food and Drug Administration.

132. The information distributed to the public, the FDA, and Plaintiff by Defendants included, but was not limited to websites, information presented at point of sale and in marketing, information disseminated by company representatives, reports, press releases,

advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Defective Sunscreen Products.

133.    Defendants intentionally made material misrepresentations to the public, including Plaintiff, regarding the safety of the Defective Sunscreen Products specifically that they did not have dangerous and/or serious adverse health safety concerns, and that the Defective Sunscreen Products were safe or safer than other similar products available.

134.    Defendants intentionally failed to warn purchasers and the public, including the Plaintiff, of the dangers and risk of injury.

135.    Defendants chose to falsely market the purported safety, efficacy, and benefits of the Defective Sunscreen Products instead.

136.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and Plaintiff; to gain the confidence of the public and Plaintiff; to falsely assure them of the quality and fitness for use of the Defective Sunscreen Products; and induce Plaintiff, and the public to purchase and continue to use the Defective Sunscreen Products.

137.    Defendants made claims and representations in its documents submitted to the FDA and its reports to the public and in advertisements that the Defective Sunscreen Products have beneficial properties and do not present serious health risks.

138.    These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist and were made recklessly and without regard to the true facts.

139.   These representations, and others made by Defendants, were made with the intention of deceiving and defrauding Plaintiff and the public and were made in order to induce Plaintiff to rely on misrepresentations, and caused Plaintiff to purchase, rely on, use, and request the Defective Sunscreen Products.

140.   Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Defective Sunscreen Products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

141.   Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations, for the purpose of deceiving and lulling Plaintiff and consumers into a false sense of security, so that Plaintiff and consumers would rely on Defendants' representations, and Plaintiff and others would request and purchase the Defective Sunscreen Products.

142.   At the time the representations were made, Plaintiff did not know the truth about the dangers and serious health and safety risks inherent in the use of the Defective Sunscreen Products. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendant's misrepresentations.

143.   Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Defective Sunscreen Products, Plaintiff would not have purchased or used, or relied on the Defective Sunscreen Products.

144. Defendants' wrongful conduct constitutes fraud, suppression, concealment, and deceit, and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiff.

145. As a direct and proximate result of Defendants' conduct, the Plaintiff experienced significant mental and physical pain and suffering and sustained an injury that subsequently caused his death. The Plaintiff has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, other damages, including loss of enjoyment of life.

146. WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages, punitive damages, together with interest, costs of suit, and such further relief as the Court deems.

## **COUNT VI – VIOLATION OF CONSUMER PROTECTION LAWS**

147. Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

148. Plaintiff purchased the Sunscreen Products for personal use and thereby suffered ascertainable losses as a result of the Defendants' actions in violation of North Carolina's Consumer Protection laws.

149. Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

   a. Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

   b. Advertising goods or services with the intent not to sell them as advertised;

   c. Over-promotion of the Defective Sunscreen Products, including but not limited to over- promotion of their safety and efficacy; and

> d. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

150.    The Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of the Defective Sunscreen Products.

151.    The Johnson & Johnson Defendants uniformly communicated the purported benefits of the Sunscreen Products while failing to disclose the serious and dangerous risk of AML related to the use of the Defective Sunscreen Products, and of the true state of the Defective Sunscreen Products safety, efficacy and usefulness. The Defendants made these representations to consumers, including Plaintiff, in the marketing and advertising described herein. The Defendants' conduct in connection with the Defective Sunscreen Products was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because the Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy and advantages of the Defective Sunscreen Products.

152.    As a result of these violations of consumer protection laws, Plaintiff incurred damages and other expenses, for which the Defendants are liable.

153.    As a direct and proximate result of the Defendants' violation of consumer protection laws concerning the Defective Sunscreen Products, as described herein, Plaintiff suffered and Plaintiff continues to suffer from the damages for which he is entitled to recover, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VII – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

154.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

155.    Defendants were regularly in the business of selling the Defective Sunscreen Products at all times relevant.

156.    The Defective Sunscreen Products are not suitable or fit for the ordinary purpose for which they are used.

157.    The Plaintiff was caused substantial harm and suffered both economic and noneconomic damages as a result of this breach of warranty.

158.    At relevant times, the Defendants intended that the Defective Sunscreen Products be used for the purposes and in the manner the Plaintiffs used it and the Defendants impliedly warranted that the recalled products are of merchantable quality, safe and fit for such use, and are adequately tested.

159.    Defendants were aware that consumers, including the Plaintiff would use the Defective Sunscreen Products in a manner that was foreseeable.

160.    Plaintiff was at all relevant times in privity with the Defendants.

161.    The Defective Sunscreen Products were expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which they were manufactured and sold.

162.    The Defendants breached various implied warranties with respect to the Defective Sunscreen Products, including the following particulars:

      i.    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the products are safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with use.

ii.     Defendants represented that the products are safe or safer than other alternative products and fraudulently concealed information, which demonstrated it was not as safe or safer than alternatives available on the market;

iii.    The Defendants represented that the products were as efficacious than other alternative treatments and fraudulently concealed information about the true efficacy; and

iv.     In reliance upon the implied warranties, Plaintiff used the products as prescribed in the foreseeable manner normally intended, recommended, promoted, and marketed by the Defendants.

163.    Defendants breached their implied warranties to Plaintiff in that the Defective Sunscreen Products are not of merchantable quality, safe and/or fit for intended use, or adequately tested, in violation of common law principles.

164.    As a proximate result of the breaches of warranty, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, comfort, and economic damages.

## COUNT VIII -  BREACH OF IMPLIED WARRANTY OF FITNESS

165.    Plaintiff realleges and incorporates by reference every paragraph of this Complaint as though fully set forth herein.

166.    Defendants were regularly in the business of selling the Defective Sunscreen Products at all times relevant.

167.    Defendants knew that the purchasers, consumers, and Plaintiff were relying on their skill or judgment to provide a suitable product.

168.    The Defective Sunscreen Products are not suitable or fit for the particular purpose for which they are used.

169. The Plaintiff was caused substantial harm suffered both economic and noneconomic damages as a result of this breach of warranty.

## COUNT IX – LOSS OF FILIAL CONSORTIUM

170. Plaintiffs re-allege all the preceding paragraphs as though fully set forth here.

171. Loss of filial consortium is a derivative claim. It is a derivative of each of the claims and allegations above.

172. At all relevant times, Plaintiff was the lawful father of the Braylan.

173. Because of the rare leukemia diagnosis and untimely death suffered by Braylan, which was caused by his unknowing exposure to benzene, a dangerous carcinogen, and as a direct and approximate result of the Defendants' negligence, the Plaintiff was deprived of loss of companionship, comfort, society, guidance, solace and love of DORY BRAYLAN HUX to his parents and family as a direct result of his wrongful death. The Plaintiff continues and will continue to suffer from extreme mental anguish and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

  i. That process issue and the Defendants be served in accordance with the Federal Rules of Civil Procedure;

  ii. That Plaintiffs be awarded all damages they are deemed entitled to in an amount to be determined by the enlightened conscience of a jury;

  iii. That Plaintiffs be allowed to amend this Complaint in accordance with the Federal Rules of Civil Procedure;

  iv. That the Plaintiffs be awarded punitive damages;

  v. That Plaintiffs have a trial by jury as to all issues; and

  vi. That Plaintiffs be awarded such other relief as this Court may deem just and proper.

Date:   April 14, 2023

Respectfully submitted,

s/ Brett E. Dressler
Brett E. Dressler (NC Bar # 34516)
**SELLERS AYERS DORTCH & LYONS, P.A.**
301 Midtown Building, Suite 410
301 South McDowell Street
Charlotte, NC  28204
Telephone: (704) 377-5050
Facsimile: (704) 927-2868
E-mail:  bdressler@sellersayers.com

s/ Mark E. Chavez
David P. Matthews *(Pro Hac Vice Forthcoming)*
Mark E. Chavez  *(Pro Hac Vice Forthcoming)*
**MATTHEWS & ASSOCIATES**
2905 Sackett Street
Houston, Texas 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7132
E-mail: dmatthews@thematthewslawfirm.com
E-mail: mchavez@thematthewslawfirm.com

*Counsel for Plaintiffs*